880 A.2d 608

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jose DeJESUS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Aug. 27, 2003.

Decided Aug. 17, 2005.

in the short-sentence paradigm lie beyond the available scope of our review.

30

Jose DeJesus, Esq., David Scott Rudenstein, Esq., for Jose DeJesus.

Hugh J. Burns, Esq., Amy Zapp, Esq., Karla Gebel Perrin, Philadelphia, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice CASTILLE.

This matter is an automatic direct appeal from a sentence of death imposed by the Court of Common Pleas of Philadelphia County. Without discussing the merits of the claims raised by appellant, this Court remanded the case to the trial court for issuance of an opinion in accordance with Pa.R.A.P.1925, retaining jurisdiction and specifying that the trial court was to address two apparently-preserved claims of trial court error that had not been discussed in the trial court's original opinion. See Commonwealth v. DeJesus, 581 Pa. 632, 868 A.2d 379 (2005).[1] The trial court has since issued an opinion addressing those claims, and we now pass upon the merits of the appeal. We affirm.

As a preliminary matter, as we noted at the outset of our original opinion, in addition to the two claims of trial court error which the trial court has discussed on remand, appellant raises a total of six claims sounding in the ineffective assistance of trial counsel, and a seventh procedural claim which requests a remand for an evidentiary hearing on the general question of ineffectiveness. See DeJesus, 581 Pa. at 635 n. 6, 868 A.2d at 381 n. 6. Prior to our opinion and order remanding the matter for a supplemental trial court opinion, appellant filed with this Court a Motion to Remand for Evidentiary Hearing on his ineffectiveness claims. In a per curiam order, dated June 10, 2003, we specifically denied that motion without

1. The relevant procedural facts leading up to the appeal are discussed in that opinion. See DeJesus, 581 Pa. at 634–35, 868 A.2d at 380–81.

prejudice to appellant to file those claims under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, citing *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002). We likewise reject appellant's renewed request that we review his ineffectiveness claims on this direct appeal or, in the alternative, remand for an evidentiary hearing on those claims. In *Grant*, this Court held that claims challenging the effective assistance of prior counsel presumptively should be deferred for collateral review under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, and that the rule would apply to the parties in that case and to "those cases currently pending on direct appeal." *Grant*, 813 A.2d at 738. We have since held that the *Grant* rule is applicable in capital cases, *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), and most recently, in *Commonwealth v. O'Berg*, 584 Pa. 11, 24–27, 880 A.2d 597, 605–06, 2005 WL 1958356 (2005), we have reiterated the presumption favoring deferral of such claims under the PCRA. Because appellant's appeal was pending when *Grant* was decided, we decline to review his ineffectiveness claims on this direct appeal. Furthermore, we reject appellant's contention that *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717 (2000), which came before this Court as an appeal from the denial of a PCRA petition, requires this Court to remand the matter for an evidentiary hearing directed to trial counsel's ineffectiveness. Unlike the defendant in *Basemore*, appellant seeks to forward his ineffectiveness claims on direct appeal, a stage which is governed by the *Grant* rule. An ineffectiveness hearing will be appropriate when, and if, appellant chooses to forward ineffectiveness claims upon collateral review under the PCRA. Accordingly, we dismiss each of appellant's ineffectiveness claims without prejudice to appellant's right to pursue these claims via a petition for relief under the PCRA.

As we do in all capital direct appeals, we will first review the evidence to ensure that it is sufficient to support the first-degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We do so notwithstanding that appellant does not challenge the suffi-

ciency of the evidence. *Freeman*, 573 Pa. 560–61, 827 A.2d at 402. When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000). A person is guilty of first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502; *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 267 (2000).

The evidence adduced at trial established that appellant and a man known as "Capone" had an on-going dispute in June of 1997. On June 19, 1997, Capone and several acquaintances allegedly opened fire with firearms on appellant's house, located at 2902 Palethorp Street in Philadelphia. Sometime before 8:00 p.m. on June 20, 1997, appellant noticed a man, who apparently looked very much like Capone and was wearing a bandana on his head, driving a new, blue Toyota Corolla that appellant knew to be owned by Capone in and around appellant's neighborhood. At around 8:00 p.m., after having observed the Toyota driving in his neighborhood, appellant entered a light-colored station wagon parked in front of his house and exited the car carrying an AK–47 assault rifle. Appellant then went into an abandoned house at 2913 Palethorp and ascended to the roof of the building. About a minute later, the Toyota Corolla rounded the corner of Cambria and Palethorp Streets and began traveling on Palethorp, past the abandoned building. Upon seeing the car, appellant opened fire on the vehicle and its driver, strafing the rifle

from side to side and spraying bullets up and down Palethorp Street. Unbeknownst to appellant, Capone was not in the Toyota Corolla, but rather, the car was being driven by Carlos Martinez, to whom Capone had apparently sold the car that very day. Six of appellant's shots shattered the car's windows, and one shot struck Martinez in the back. Martinez eventually died from the wound.[2]

While appellant was firing, McKinley Williams, who had been washing his car nearby, heard the shots and, thinking that the sound was that of firecrackers, began walking toward the noise. Upon seeing that appellant was firing a rifle onto the street, Williams turned and began running in the opposite direction but was struck by one bullet in his left calf, two bullets in his left buttock, and one bullet on the left side of his head. Williams continued running towards Cambria Street even after being shot.[3] At the same time, fifteen-year-old Angel Correa was riding his off-road motorcycle on the street in front of the 2902 residence and carrying three-year-old Luis Ortiz as a passenger. When Angel heard the gunshots, he was startled and fell while still seated on the bike and holding the child. Angel covered Luis until the gunshots stopped, but when Angel later returned the child to his mother, it was discovered that Luis had suffered a gunshot wound to his left

2. After being shot in the back, Martinez attempted to exit the car through the driver's side window but became too weak and eventually lost consciousness, so that his body was slung partially out of the window with his head almost touching the ground. Philadelphia Police Officer Rafae Guadalupe, who responded to a radio call regarding the shooting, found Martinez lying on the ground next to the car and bleeding heavily from the chest. Officer Jerry Torres transported Martinez to Temple University Hospital in his police cruiser, but Martinez was pronounced dead within a half hour of arriving at the hospital. An autopsy revealed that a bullet struck Martinez in the back, traveled through his kidney, spleen, stomach, liver, and inferior vena cava, and exited under his ribs on the right side of his abdomen. The cause of death was determined to be the massive bleeding from the wound to the inferior vena cava.

3. Williams was treated at the hospital for four gunshot wounds, and doctors removed the bullet from his head while leaving the other bullets for fear of complications. Williams remained in the hospital for three days.

knee and one to his left foot.[4] Both McKinley Williams and Luis Ortiz survived. Following the shooting, the police recovered sixteen 7.62 × 39 mm cartridge casings from the area in front of 2913 Palethorp, all of which were determined to have been fired from an AK–47 rifle. In addition, six bullet holes were discovered in the Toyota Corolla that had been driven by Carlos Martinez—three in the driver's side of the front hood of the car and three in the roof.

After evading police custody for approximately three months, appellant was arrested on September 23, 1997, when members of the Philadelphia Police Fugitive Squad surrounded a house at 1537 Ruan Street, where appellant had been staying, and detained him there.[5] Following his arrest, appellant was transported to the police station, where he gave a statement to police. Appellant admitted his involvement in the shooting, explaining, *inter alia,* that Capone had shot at his house the day before, and that when he saw the "Capone wagon," he "lit it up" because he thought Capone "must be coming back again." N.T., 7/1/98, at 79.

The foregoing evidence fully supports the jury's finding that appellant was guilty of first-degree murder. Carlos Martinez was unlawfully killed; appellant committed that killing, acting with the specific intent to kill, evidenced by the use of an especially deadly weapon upon a vital organ of the victim's body; and the killing was done with premeditation and deliberation, as evidenced by appellant's motivation, his actions, and his admission to police.

We now turn to the remaining two claims raised by appellant, which have now been addressed by the trial court: (1) that the trial court erred by permitting, over trial counsel's

---

4. Luis was treated at the hospital for two gunshot wounds and remained there for three weeks.

5. On September 2, 1997, two Philadelphia police officers spotted appellant driving a black Chevy Lumina and stopped at a light in the 500 block of West Allegheny Street. The officers approached appellant's car with guns drawn, attempting to arrest him pursuant to a warrant stemming from the incident, but appellant sped off through traffic. Although the officers pursued, appellant eventually exited the car and fled towards the nearby railroad tracks, evading detection.

objection, testimony that appellant possessed a shotgun some-time after the day of the crime; and (2) that the trial court erred in rejecting trial counsel's request to individually *voir dire* each juror regarding a grossly prejudicial newspaper article that was printed prior to commencement of the penalty phase.

In his first claim of error, appellant argues that the trial court erred in admitting, over the objection of defense counsel, the testimony of two witnesses, both of whom stated that they saw appellant in the possession of a sawed-off shotgun on September 1, 1997, several months after the murder.[6] Mylene Gonzalez, appellant's then ex-girlfriend, testified at trial that during the summer of 1997 homicide detectives spoke with her regarding their investigation of appellant for the murder of Carlos Martinez. Following her meeting with the detectives, she came into contact with appellant on a couple of occasions during which she asked or told appellant to turn himself in to the authorities. On one specific occasion, appellant replied to Ms. Gonzalez: "F—— them." On September 1, 1997, appellant came to Gonzalez' residence at 2860 North Palethorp and was carrying a sawed-off shotgun. N.T., 7/1/1998, at 10. The testimony of Emma Pichardo, Gonzalez' sister-in-law, corrobo-rated Ms. Gonzalez' testimony about the shotgun. N.T., 6/30/1998, at 38–39.

The trial court reasons that the foregoing evidence was admissible because "it tended to prove that the defendant had a weapon similar to the one used in preparation of the crime he was currently charged with." Trial ct. slip op. at 3–4. On appeal, appellant insists that the evidence was not relevant, and in the alternative, that whatever probative value the testimony had was outweighed by its grossly prejudicial effect. Appellant further insists that the trial court's error in admit-

6. Contrary to appellant's assertion, our review of the record indicates that trial counsel did not lodge any objection—contemporaneous or otherwise—to the prosecutor's questioning of either Commonwealth witness. However, the Commonwealth forwards no waiver argument. In addition, since this matter was briefed before this Court rendered its decision in *Freeman*, which prospectively abrogated the doctrine of relaxed waiver on direct capital appeals, we proceed to the merits.

ting this evidence was not harmless. The Commonwealth counters that the evidence, viewed in its totality, was relevant to demonstrate that defendant knew that he was a fugitive from justice, was unwilling to surrender, and had access to a powerful weapon that could have been used to resist arrest. All of this, the Commonwealth contends, constituted a chain of evidence demonstrating appellant's consciousness of guilt.[7] In the alternative, the Commonwealth maintains that even if the evidence was wrongly admitted, such error was harmless in light of the strength of its case.

 It is well settled that the decision to admit or exclude evidence is vested to the sound discretion of the trial court and will not be overturned on appeal absent an abuse of that discretion. *See Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 117 (2001). Relevant evidence is any evidence that tends to make a fact in issue more or less probable, and the relevance of a given piece of evidence is a prerequisite to its admissibility. Pa.R.E. 401; *Stallworth*, 781 A.2d at 117–18. Of course, a trial court may exclude even relevant evidence if such evidence poses a danger of unfair prejudice that outweighs its probative value. Pa.R.E. 403; *Commonwealth v. Boyle*, 498 Pa. 486, 447 A.2d 250, 254 (1982). Finally, an evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. *Commonwealth v. Story*, 476 Pa.

7. The Commonwealth relies on several cases, none of which squarely supports the purpose forwarded by the Commonwealth—*i.e.*, that appellant's possession of the sawed-off shotgun, coupled with other facts, demonstrated his unwillingness to surrender and hence, his consciousness of guilt. *See Commonwealth v. Thompson*, 559 Pa. 229, 739 A.2d 1023, 1028 (1999) (relevance of defendant's flight following commission of crime as demonstrative of consciousness of guilt); *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1260 (1994) (relevance of fact that defendant "readily obtained and disposed of handguns" that were similar to handgun used in crime); *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 909 (1991) (same as *Thompson* ); *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491, 498 (1988) (evidence of other crimes probative of motive, intent, and identity where other crimes demonstrated "tangled web of threats, intimidation and criminal activity" which arose from commission of single robbery).

391, 383 A.2d 155, 164–66 (1978) (factors to be considered in weighing harmlessness of error include: (1) whether error was prejudicial, and if so, whether it was *de minimus*; (2) whether erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to erroneously admitted evidence; and (3) whether evidence of guilt was so overwhelming, as established by properly admitted and uncontradicted evidence, that prejudicial effect of error was insignificant).

In the instant case, appellant makes general assertions regarding the definition of relevant evidence and the meaning of unfair prejudice. He cites only to one non-binding case, however, *Commonwealth v. Marshall*, 743 A.2d 489 (Pa.Super.1999), as support for his broad contention that a trial court abuses its discretion when it admits into evidence a gun not used to commit the crime in question. In *Marshall*, the defendant was tried and convicted for first degree murder, and the evidence at trial established that the victim was shot and killed with bullets from a 9 mm handgun. At trial, the Commonwealth was permitted, over the defendant's objection, to introduce into evidence a 9 mm handgun, which undisputedly was seized from the defendant prior to the killing and remained in police custody when the murder was committed. On appeal, the Superior Court reversed, noting that the weapon in question was in police custody at the time of the killing and concluding that the gun could therefore not be relevant to show that the defendant possessed the "means to commit the murder." *Id.* at 492–93.

Appellant correctly notes the similarity between *Marshall* and the facts of this case: here, the Commonwealth's witnesses referred to a gun, which, like the gun admitted into evidence in *Marshall*, was unquestionably not the murder weapon. However, appellant overstates the *Marshall* rule when he cites it for the hard and fast proposition that "where it is impossible for a gun to have been the murder weapon, it should not ... be admitted into evidence." Appellant's Brief at 28. As with any other evidence, the question of admissibility depends to a large extent upon the purpose for which the

evidence was proffered, as well as a balance of probative value and prejudicial effect. If evidence of possession of, or access to, a weapon other than the murder weapon were proffered for some other relevant purpose, no hard and fast rule could **require** its exclusion.

■ We are guided by the fundamental principle that relevant evidence is that which tends to make a material fact more or less likely. Pa.R.E. 401. Here, Ms. Gonzalez came into contact with appellant on several occasions in the months following the murder and asked or told appellant to give himself up to the police. On one occasion, appellant responded to Ms. Gonzalez, referring to the police, "F— them." Furthermore, other evidence presented by the Commonwealth showed that appellant evaded an arrest on at least one occasion in September of 1997. *See* n. 5, *supra.* That evidence made clear that appellant knew of his fugitive status and intended to evade police custody, which in turn suggested his consciousness of guilt. Furthermore, Ms. Gonzalez' testimony, corroborated by the testimony of Ms. Pichardo, that appellant possessed a sawed-off shotgun was support for the implication that appellant was serious in his intention to continue to evade—indeed, that he had the means to repel—police custody. The testimony regarding the shotgun was relevant in this aggregate context.[8]

■ Appellant's further argument that the testimony, even if relevant, was unfairly prejudicial likewise fails. In light of the totality of appellant's post-crime conduct, the probative value of the testimony in question was not outweighed by the danger of unfair prejudice. *See Boyle,* 498 Pa. 486, 447 A.2d 250. Moreover, the trial court admonished the jury during its charge that the testimony was for the "limited purpose" of showing that "the defendant had access to weapons" and not to demonstrate his "bad character" or "criminal tendencies."

---

8. Although we have deemed the evidence relevant for a purpose other than that cited by the trial court in its remand opinion, it is settled that a ruling below—here, a non-ruling, given appellant's failure to object—may be affirmed if it is correct on any ground. *See Commonwealth v. Hines,* 461 Pa. 271, 336 A.2d 280, 282 n. 3 (1975).

N.T., 7/2/98, at 73. Appellant has not alleged that the evidence was prejudicial other than to the extent that it invited the jury to evaluate him on his "unrelated criminal activity" and that it "branded and smeared" him in the eyes of the jury "as someone who toted guns in the neighborhood." Because the court's charge negated those very concerns, the evidence was not unfairly prejudicial.

 Moreover, even assuming that the testimony should have been excluded, we are satisfied that its admission was nonetheless harmless. In light of the overwhelming body of evidence in this case—notably including appellant's confession to having "lit up" the victim's car with a semi-automatic rifle—and the trial court's cautionary instruction regarding the sawed-off shotgun, we are satisfied, beyond a reasonable doubt, that the trial court's allowing the jury to hear the testimony about the shotgun, if error at all, was harmless. *See Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 138–39 (2001) (erroneous admission into evidence of co-defendants' confessions was harmless error where other properly admitted evidence, including defendant's own confession, was overwhelming); *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295, 1301 (1996) (same); *Williams*, 640 A.2d at 1261 (even if admission of defendant's possession of guns, other than crime weapon, was improper, error was harmless in light of overwhelming evidence).

Appellant's second claim of error is that the trial court erred in rejecting trial counsel's request to individually *voir dire* each juror regarding a grossly prejudicial newspaper article that was published immediately prior to commencement of the penalty phase.

On Thursday, July 2, 1997, following completion of the guilt phase of the trial, the jury returned a verdict of guilty and the court adjourned for the Independence Day weekend. Immediately prior to adjourning, however, the trial court cautioned the jury, as it had prior to the guilt phase, not to let any outside influences affect the jury's deliberations during the

upcoming penalty phase. Specifically, the court admonished the jury, in pertinent part, as follows:

> The Court: As I told you earlier, I do not want anyone to influence you in any way in any decision that's to be made in this case. Now that you've found this defendant guilty of first degree murder, I say the same thing regarding the question of sentencing. Please do not discuss this case with your family or anyone. The next time you are to discuss this case is after I give you additional instructions as to how you are to evaluate evidence . . . during the penalty phase.
>
> . . . .
>
> There is a strong possibility that your decision in this case will be reported by the media in both the print and the electronic, that's the radio, television, and newspaper. This case will probably be reported. **You are not to read or watch the news accounts of this trial. Got it?**
>
> The Jury: (nodding heads.)
>
> The Court: Let the record reflect they nodded their heads in the affirmative.

N.T., 7/2/98, at 105–07 (emphasis added).

On Monday, July 6, 1997, prior to commencement of the penalty phase and outside the presence of the jury, the trial court's tipstaff informed the court that the July 3, 1997, edition of the *Philadelphia Daily News* contained an article discussing appellant's trial. Neither the court nor the parties were aware of the article or its content, and the court requested the tipstaff to acquire a copy. The court then welcomed the jury back from the holiday weekend and the following exchange took place:

> The Court: Good morning, Ladies and Gentlemen.
>
> The Jury: Good morning.
>
> The Court: I trust that you all had an enjoyable and remarkable Fourth of July.
>
> The Jury: (nodding heads.)
>
> The Court: I trust that you followed my instructions and did not seek out any media coverage of our trial.

The Jury: (nodding heads.)

The Court: So we'll proceed with what we call the penalty phase of this trial.

N.T., 7/6/98, at 4–5. After all penalty phase testimony was completed, and immediately before the defense rested, the trial court held an *in camera* meeting with the attorneys in order to discuss the nature of the news article, a copy of which had been obtained and which was entitled "Drug Hit Man Convicted of Murder One." During the meeting, defense counsel read the following excerpt from the article: "DeJesus . . . is awaiting trial for the murder[s] of another man and a pregnant woman, and is awaiting a preliminary hearing for a fourth killing." *Id.* at 14–15, 640 A.2d 1251. Defense counsel also noted that the article referred to appellant as a "hit man" for a drug mob. Defense counsel requested that the trial court individually *voir dire* each juror in order to ascertain whether or not he or she had read the article. The court declined, noting that it had cautioned the jury, prior to adjournment, not to expose itself to media coverage of the trial and that the jury had already indicated its adherence to those instructions.

■ In its opinion, the trial court concluded that, "[as] the initial group questioning of the jurors did not elicit any response indicating that any of them had been exposed to media coverage, there was no basis upon which to conduct individual *voire dire* regarding the newspaper article." Trial ct. slip op. at 3. Appellant contends that the trial court's refusal to permit individual *voire dire* was an error entitling him to a new penalty hearing. The Commonwealth counters that the trial court's instructions and the jury's collective responses thereto were adequate assurance that the jury was not prejudiced by the single article in question.

In *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976), this Court considered what measures a trial court must take to ensure the impartiality of a jury in the face of prejudicial publicity that arises during the trial. Prior to the trial in *Bruno*, the trial court granted the defendant's motion to suppress his confession but denied his request for a change

of venue. Following commencement of the trial, the court denied the defendant's request to sequester the jury and later denied a motion for mistrial based on the publicity in question, some or all of which made express reference to the suppressed confession.

On appeal, this Court noted the following relevant facts: the publicity involved the suppressed confession, about which the jury would otherwise have been uninformed; the publicity was widespread and highly prejudicial, manifested in numerous front-page news articles and on news broadcasts; at the start of trial, the court failed to specifically instruct the jury not to expose itself to media coverage of the trial, but instead merely suggested that the jury not do so; and finally, defense counsel repeatedly requested that the trial court individually question the jurors regarding the publicity. The *Bruno* Court began its analysis by recognizing the baseline principle that due process requires that "the jury consider only the evidence developed before it at trial," and the potential for heightened prejudice where the jury becomes aware of "inadmissible evidence from outside sources ... because of the absence of any procedural safeguards." *Id.* at 49. In ultimately concluding that the trial court was required to individually question each juror as to whether he or she was exposed to the publicity in question, the Court considered crucial the fact that the trial court had failed to adequately instruct the jury in the first place. *Id.* at 51. The Court explained:

> When there is a possibility of highly prejudicial materials reaching the jury, the trial court must take appropriate protective action.... [T]he proper precautions .... must reasonably ensure that no prejudice will occur.

Here, details of [the defendant's] suppressed confession were the subject of highly prejudicial front page news articles and news broadcasts. Even a random glance at a news rack would have been sufficient to convey the existence of the confession. **The court gave an inadequate precautionary instruction to the jury and took no direct action to ensure that they were not exposed to such highly prejudicial information.** In such circumstances,

the trial court should have questioned each juror as appellant's counsel frequently requested to ensure that the publicity had not in fact reached the jury. The failure to do so denied appellant any chance to show actual prejudice. Such a procedure is required, upon the request of either party. . . .

\* \* \*

The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of other jurors. However, **questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case.**

*Id.* at 265–68, 352 A.2d at 51–52 (citations omitted) (emphasis added). Concluding that the trial court's errors deprived appellant of the opportunity to show actual prejudice, the Court reversed and remanded for a new trial. *Id.* at 267–68, 352 A.2d at 52.

Although appellant does not cite or rely upon *Bruno*,[9] the Commonwealth recognizes our holding in that case. However, the Commonwealth urges that the trial court correctly ruled that, in the instant case, its instructions and subsequent inquiry were sufficient to protect appellant. We agree.

Although the nature of the harmful publicity in *Bruno,* as here, highlighted prejudicial facts that were not in evidence at trial—*i.e.,* in *Bruno,* a suppressed confession; here, other alleged murders—the publicity in *Bruno* was widespread. Indeed, the *Bruno* court cited four newspaper articles, one of which appeared on the front page of a local newspaper, and noted extensive radio coverage regarding the trial and the confession, all of which were brought to the trial court's

9. Instead, appellant relies on *Commonwealth v. Cohen,* 489 Pa. 167, 413 A.2d 1066 (1980), and *Commonwealth v. Carter,* 537 Pa. 233, 643 A.2d 61 (1994), both of which turned on claims that the trial court improperly denied the defendant's request for a change of venue based upon **pretrial** publicity. Although the body of law addressed to that question is not entirely distinct from that at issue *sub judice,* it suffices for present purposes to note that those cases are both factually and legally distinct and thus not dispositive here.

attention by defense counsel. *Bruno,* 466 Pa. at 258–61, 352 A.2d at 47–48. Here, in contrast, the extent of the publicity at issue was merely one newspaper article—the positioning and prominence of which in the newspaper is not revealed by the trial transcript, the trial court, or the parties. Furthermore, the decision in *Bruno* hinged upon the trial court's initial failure to caution the jury adequately about its obligation to avoid media exposure, a duty the trial court squarely undertook in the instant case. Whereas, in *Bruno,* the court merely offered a suggestion, here, the court affirmatively directed the jury not to "read or watch the news accounts of this trial." N.T., 7/2/98, at 107. Finally, the decision in *Bruno* expressly recognized that "questioning jurors as a group or giving special precautionary instructions may be a sufficient precaution depending on the facts of the particular case." *Bruno,* 466 Pa. at 267–68, 352 A.2d at 52. The trial court's instructions in this case, and its group questioning, were more than sufficient in light of the facts of this case.[10]

Finally, this Court is required to conduct a statutory review of the death sentence. Pursuant to 42 Pa.C.S. § 9711(h)(3), this Court must affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

*Id.* Here, the jury unanimously found one statutory aggravating circumstance—*i.e.,* that appellant, while in the commission of the offense, knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7)—and one mitigating circumstance—*i.e.,* that appellant was only eighteen years of age at the time of the crime, 42 Pa.C.S. § 9711(e)(4). Here, the evidence showed that appellant, while standing on a rooftop, opened fire with an

10. We are also aware that *Bruno* involved publicity that arose while the trial was ongoing, whereas, the publicity here arose after the guilt phase verdict and before sentencing. We express no view on whether this distinction weighs for or against the current claim.

assault rifle on a car passing through a street in a residential area and that he, in fact, injured two other people who were struck with bullets. Such evidence was sufficient to support the jury's finding that appellant knowingly created a grave risk of death to not one, but numerous, persons during the commission of the instant murder. Furthermore, our independent review of the record demonstrates that the jury's sentence of death, which followed upon a consideration of all potential mitigating circumstances, and then a weighing of the aggravator and mitigator actually found, was not the product of passion, prejudice, or any other arbitrary factor, but rather, resulted from the proper discharge of its sentencing function.

Accordingly, we affirm appellant's convictions and sentence of death and dismiss appellant's claims of ineffective assistance of trial counsel without prejudice to his raising those claims upon collateral review. Jurisdiction relinquished.[11]

Justice NIGRO files a concurring opinion.

Justice NIGRO, concurring.

I write separately merely to note that I am not convinced that the trial court's instruction to the jury regarding the limited purposes of the testimony concerning Appellant's possession of a sawed-off shot gun "negated" the prejudice suffered by Appellant from this testimony, which undoubtedly placed him in a bad light. *See* Majority Slip Op. at 10–11; *see also, e.g., Commonwealth v. Richardson,* 496 Pa. 521, 437 A.2d 1162, 1166 (stating that certain clearly prejudicial testimony cannot be cured by instructions) (Nix, J., dissenting); *id.* (same) (Roberts, J., dissenting). Nevertheless, I agree with the majority that any error in admitting this evidence was harmless in light of the overwhelming evidence of Appellant's guilt, including, most predominantly, his own confession.

11. The Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S. § 9711(i).