J-A09027-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS PADIKAL | : | |
| | : | |
| Appellant | : | No. 224 EDA 2021 |

Appeal from the Judgment of Sentence Entered November 13, 2020
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0007361-2018

BEFORE:   NICHOLS, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:　　　　　　**FILED SEPTEMBER 14, 2022**

Thomas Padikal ("Padikal") appeals from the judgment of sentence imposed following his convictions for involuntary deviate sexual intercourse with a child, aggravated indecent assault of a person less than thirteen years old, indecent assault of a person less than thirteen years old, and corruption of minors.[1]  We affirm.

In 2007, eight-year-old K.C. moved with her mother to a house in Bensalem with Padikal, her mother's boyfriend.  Padikal was responsible for the girl's care in the afternoons between her return from school and the end of her mother's workday.  On a daily basis for almost three years, Padikal would ask K.C. if she wanted to go upstairs to "have fun."  N.T., 6/19/21, at 11-13.  He would take her to an upstairs bedroom, undress her and himself,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 3123(b), 3125(a)(7), 3126(a)(7), 6301(a)(1).

lie on the bed beside her, and penetrate K.C.'s vagina with his fingers and tongue. He would also force K.C. to masturbate him. K.C. was scared to reveal Padikal's abuse. *Id*. at 7-28, 71.

When K.C. was in the fifth grade, Padikal and her mother broke up. She and her mother moved first into their own Bensalem apartment and then to Texas. Ten years later, Padikal began contacting K.C.'s friends on Facebook. K.C. instructed them not to accept his friend requests. Padikal then contacted K.C. directly with repeated Facebook messages. In one message, he included a link to a website he had created whose domain name included her first name. The website contained thirty-three photos of K.C., some from her time in Bensalem and some from her time in Texas.[2] Many of the photos were captioned. One read, "This amazing man loved me like I'm a princess. No wonder I can't stay away from him ever," and others were captioned, "No wonder I fell in love with him," and "No wonder I fell I love with you, Tom. You made me come alive. You're a godsend hero." K.C. did not respond to Padikal's attempts to contact her. *See* N.T., 6/18/19, at 36-38, 41-44; N.T., 6/19/19, at 27-37, 80, 94-95.

When K.C. was seventeen years old, she revealed Padikal's abuse to her boyfriend and then to her mother, and had a strong emotional reaction that led her to seek therapy. About one year later, K.C. reported Padikal's abuse to Bensalem police, who arranged for Texas police to interview her. Texas

---

[2] K.C. did not give Padikal any of the photos and had no involvement in the creation of the website. *See* N.T., 6/19/21, at 37.

police forwarded a recording of their interview of K.C. to Bensalem police, who then undertook a "text takeover" in which they posed as K.C. on Facebook and engaged in on-line conversations with Padikal. During almost 100 conversations over the course of ten days, Padikal gave the person he believed to be K.C. his phone number and email address and repeatedly attempted to call her via Facebook. Padikal wrote in his messages to K.C. that he "used to love it when you [would] come home from school and . . . get naked in bed, grab my hand and place it on your naked body. You really enjoyed it." He repeatedly gave her his phone number, called her "Princess," identified himself as "Dad," told her that he loved her, and urged her to call him. *See* N.T., 6/19/19, at 38-47, 80-81, 99-100, 115-130, 134.

In another exchange, the person writing as K.C. told Padikal, "You touched my privates. I was just a kid." Padikal responded, "Well you touched me first. I thought you were learning – I thought we were learning about each other. But if you ask that I apologize, I sure will, Princess." Padikal also wrote that K.C. herself initiated sexual contact with him: "Like I said, you asked me to. You even took my hands and did that, remember? I really didn't want to, but did it because you took my hand and put it there." *See* N.T., 6/19/19, at 132-133.

Bensalem police had K.C. come to Pennsylvania so that they could record her having a telephone call with Padikal. In that call, Padikal told K.C. that, "I did not force you to do anything," and that K.C., who was eight years old at the time he began abusing her, had initiated sexual contact with him by

stripping herself, and putting his hands on her body, including between her legs, and that when she did, he would touch her genitals. **See** N.T., 6/19/19, at 171; Commonwealth's Exhibit C-9 ("C-9") at 23:44-26:00.[3] Padikal told K.C. that he had been afraid to engage in more intimate sexual conduct with her and kept his genitals away from hers because he was afraid of impregnating her. **See** C-9 at 26:12-26:30. He admitted to placing his fingers in her vagina and to placing his tongue against her clitoris, which he said gave her ecstasy. **See id**. at 26:33-28:21. Padikal gave K.C. the address of the website he had created with photographs of her as a child. He stated his willingness to visit her in Texas and to stay with her in a hotel. He also told her that, "I really, really, really love you, sweetheart." **See** N.T., 6/19/19, at 137-40, 170-71; C-9 at 40:00-40:08.

After the phone call, Padikal continued to send messages to K.C., including one in which he attached a photo of her as a girl with him standing by an airplane. He declared his desire to "make out" with her in the cockpit of a jet and impregnate her at 30,000 feet. **See** N.T., 6/19/19, 141. He also wrote, "Love you, Princess. Will you be mine, Baby," and asked her how many people she wanted at their wedding reception. Padikal requested a nude photo of K.C., and told her she was "an expert in the art of seducing a guy." He repeatedly contacted her and gave her his home address. **See id**. at 141-53.

---

[3] The citations to C-9 indicate the times on the audio-recording when Padikal made the statements referenced.

New Jersey law enforcement officers, accompanied by Bensalem police, arrested Padikal at his New Jersey home. During a tape-recorded interview, Padikal told Bensalem Township Detective David Nieves that he and K.C. had both initiated inappropriate touching. *See* N.T., 6/19/19, at 174-75, 186; N.T., 6/20/19, at 4-5. In the interview, Padikal said that on one occasion, K.C.'s mother had observed K.C.'s hand on his genitals, and that he had told her that it was better for K.C. to learn about the human body inside of the family than outside. *See* N.T., 6/20/19, at 4-5; Commonwealth's Exhibit C-11 ("C-11") at 20:50-21:20.[4] During the playing of the recorded interview at trial, Padikal objected to Detective Nieves's statement that Padikal showed no remorse and was "evil" as prejudicial and not relevant. *See id*. at 28:45. The trial court agreed and the jury did not hear any more of the interview. *See* N.T., 6/20/19, at 5.

During the search of Padikal's house following his arrest, police found a gun registered in his name. *See id*. at 8. On Padikal's computer, they found images of K.C.'s face as a child superimposed on the bodies of naked adult women. *See id*. at 11-13. Police also recovered mail in Padikal's handwriting that stated:

> I think you both know [K.C.] was nine years old, or thereabouts, when she began to make advances to me by saying, quote, Can you spend some time with me. Fact is, I really didn't

---

[4] The citations to C-11 indicate the times on the audio-recording when the referenced statements were made.

want to.  I didn't want to go into her room, but I didn't go or say anything.  I was surprised when she walked into my room, completely naked, and sat on my lap with her legs wrapped around me.  She began moving back and forth and kissing me; in the mouth, too.

I wanted her to stop, but she was under the influence of her sexual energy. . ..  [I] stood up, gently pushing her away, moving my arms from her tender breasts.

. . . .

I am more than happy to send her a few hundred dollars every month for a couple of years if she will withdraw these charges immediately.  I promise.  About the question you asked me, Now that you're almost 21, if I would marry you, I am not sure.  We must discuss this and get some clarity about what it is. . ..  [C]ontact me when you drop the charges and we'll talk about it.  You must be a beautiful woman now, and I suppose that is not out of the question.  At least then, if [sic] all legal, right?  And I may be able to have you work for one of my corporations.  God bless you [K.C.].  And say hi to [your mother]. Sincerely yours, Thomas Padikal.

N.T., 6/20/19, at 15-17; Commonwealth's Exhibit C-14.

The jury convicted Padikal of the charges against him.  The trial court imposed a term of 180 months to 360 months of imprisonment, and lifetime registration as a sexual offender, for involuntary deviate sexual intercourse with a child.[5]  **See** N.T., 10/15/19, at 7, 47.[6]  On Padikal's motion for reconsideration, the court reduced his sentence to 150 months to 300 months of imprisonment.  **See** N.T., 11/13/20, at 6-7, 17-18.

---

[5] Lifetime registration was imposed pursuant to subchapter I, 42 Pa.C.S.A. § 9755(b)(2)(i)(A).

[6] Padikal received no further penalty for his other convictions.

- 6 -

Padikal filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

On appeal, Padikal raises the following issues for our review:

I.      Whether the Commonwealth's evidence unduly prejudiced [Padikal] and impermissibly encroached on his character, where the lead investigator testified as to his training as a polygraph examiner with an inability to stop detecting deception, and the jury heard evidence of the investigator stating that he can tell when a person is completely deceptive, and where the Commonwealth entered evidence of the investigator['s] opinion of [Padikal] being an evil individual who has no remorse for his crimes.

II.     Whether the Commonwealth's proffered evidence and continued argument to the jury regarding [Padikal's] possession of a firearm and his deception of the same during an interrogation with law enforcement, was in contravention of the Rules governing character evidence and caused undue prejudice to [Padikal].

Padikal's Brief at 4.

Padikal's first issue claims that Detective Nieves offered improper testimony about his expertise in assessing credibility by presenting himself as "a human lie detector" as a result of his experience with polygraphs, which bolstered the detective's assessment in the recorded interview that Padikal showed no remorse and was "evil."  Padikal asserts that the detective's opinions were impermissible attacks on his character for truthfulness and law-abidingness.

The admissibility of evidence is in the trial court's discretion and will not be reversed absent an abuse of that discretion.  *See Commonwealth v.*

*DeJesus*, 880 A.2d 608, 614 (Pa. 2005). An abuse of discretion exists where the trial court overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. *See Commonwealth v. Norton*, 201 A.3d 112, 120 (Pa. 2019).

The trial court initially concluded that Padikal did not timely challenge Detective Nieves's testimony about his polygraph training and, further, that Padikal's objection and the court's intervention prevented the detective from offering improper opinion testimony. *See* Trial Court Opinion, 7/16/21, at 7-9.[7]

Having reviewed the record, we agree with the trial court that Padikal waived his claim, and the detective did not give improper opinion testimony. Detective Nieves made a brief reference about attending polygraph school, and then asserted that he had learned to focus on verbal and nonverbal cues to assess whether someone is telling the truth or being deceptive. *See* N.T., 6/19/19, at 179-80. Padikal did not object to that testimony, and therefore waived any challenge on appeal to its admission. *See* Pa.R.A.P. 302(a) (stating that claims first raised on appeal are waived); *see also Commonwealth v. Benvenisti-Zarom*, 229 A.3d 14, 26 (Pa. Super. 2020)

---

[7] The trial court also found that Padikal had failed to request a cautionary instruction, and that any error in the detective's testimony was harmless. *See id*.

(holding that the failure to make a proper objection at trial to the scope of a witness's testimony waives the claim that the trial court abused its discretion by admitting that testimony).[8]

We further agree with the trial court that Padikal's objection and the trial court's action prevented the detective from giving improper opinion testimony. After Detective Nieves mentioned his polygraph training, he began describing his interview of Padikal. Padikal objected and asked for a sidebar discussion, at which he expressed a concern that the detective would offer an inadmissible opinion about Padikal's character for honesty. *See* N.T., 6/19/19, 181-82. The trial court told the prosecutor that the detective could discuss his observations, but could not offer an opinion about whether Padikal was lying. *See id*. at 180-84. Following the sidebar, the detective did not offer his opinion of Padikal's honesty. *See id*. at 184-187. The absence of inadmissible testimony precludes relief without regard for the trial court's additional conclusion that any error was harmless. *Cf. Commonwealth v. Spotz*, 47 A.3d 63, 115 (Pa. 2012) (declining to review claim based on

_____

[8] Polygraph evidence is inadmissible at trial as evidence of guilt. *See Commonwealth v. Watkins*, 750 A.2d 308, 315 (Pa. Super. 2000). Even when the results of a polygraph test are mentioned at trial, however, the reference must be explicit to compel the grant of a new trial. *See Commonwealth v. Sneeringer*, 668 A.2d 1167, 1174 (Pa. Super. 1995). We note that here Detective Nieves did not testify that he administered a polygraph exam to Padikal. Thus, the detective's general, unobjected-to reference to polygraph training cannot compel the grant of a new trial for that additional reason. *See Sneeringer*, 668 A.2d at 1174.

testimony not admitted in lower court).

Padikal also asserts that the jury improperly heard Detective Nieves's assertions to Padikal in their recorded interview, played on the detective's second day of testimony, that Padikal had no remorse and was "evil," which he asserts was improper character evidence.[9]  The trial court found that Padikal waived his claim of error because he did not request a cautionary instruction or a mistrial after the court agreed with him that the remark was inadmissible,[10] and that the error was, in any event, harmless.  **See** Trial Court Opinion, 7/16/21, at 10-12.

We agree with the trial court that Padikal waived this claim.  Although Padikal objected when he heard the detective's remark during the playing of the recorded interview, and told the trial court at sidebar that the remark was "prejudicial and not relevant,"  **see** N.T., 6/20/19, at 5,[11] he won the objection but did not seek a cautionary instruction or request a mistrial.  **Id**. at 5-6. Thus, he waived his claim.  **See Commonwealth v. Sandusky**, 77 A.3d 663,

---

[9] The remark occurred approximately twenty-eight minutes and forty-five minutes into the playing of C-11.  **See** N.T. 6/20/19, at 5.

[10] Because the objection was resolved at a sidebar discussion, the trial court did not formally sustain the objection in open court.  **See** N.T., 6/20/19, at 5.

[11] Padikal's relevance objection did not assert that the remark constituted inadmissible character evidence, arguably waiving that appellate theory of relief.  **See Commonwealth v. Rivera**, 238 A.3d 482, 499 (Pa. Super. 2020) (holding that this Court cannot review a legal theory offered in support of a claim where that theory was not presented to the trial court).

670 (Pa. Super. 2013) (holding that even where a defendant objects to specific conduct, his failure to request a specific remedy such as a mistrial or a curative instruction is sufficient to constitute waiver).

Even were Padikal's issue preserved, it would fail because any error caused by the jury hearing the detective's remark was harmless. An error is harmless only where:

> (1) the error did not prejudice defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Williams,*** 274 A.3d 722, 735 (Pa. Super. 2022) (citation omitted and italics supplied).

The evidence of Padikal's guilt was abundant. The evidence included K.C.'s testimony, Padikal's Facebook messages to K.C. admitting to having involuntary deviate sexual intercourse and other sexual contact with her when she was under thirteen, the recorded telephone call in which Padikal admitted that he digitally and orally penetrating K.C. when she was under thirteen, Padikal's computer file containing pre-pubescent K.C.'s face superimposed onto naked women's bodies, Padikal's written assertion that K.C. had seduced him, and Padikal's handwritten letter offering to pay K.C. to withdraw the charges against him. That evidence was so overwhelming that the detective's fleeting recorded assertion about Padikal's character cannot have contributed

to the verdict. *See Williams*, 274 A.3d at 735. Therefore, on Padikal's first issue no relief is due.

In his second issue, Padikal asserts that the evidence of his possession of a gun was inadmissible because it showed a prior crime or bad act, and that the prosecutor made improper reference in closing argument to Padikal's statements about the gun as evidence of his dishonesty. *See* Padikal's Brief at 17, citing N.T., 6/21/19, 23-24.

The trial court found that Padikal waived his objection to the evidence of the gun presented at trial, and similarly waived his challenge to the prosecutor's closing argument by failing to timely object. *See* Trial Court Opinion, 7/16/21, at 13.

We agree. Padikal's failure to object to the testimony that he owned a gun waived his claim that the trial court abused its discretion by admitting that evidence about the gun. *See* Pa.R.A.P. 302(a); *see also Benvenisti-Zarom*, 229 A.3d at 26. Similarly, Padikal raised no objection to the prosecutor's reference to his gun possession, either during the prosecutor's closing argument or afterward. He thereby waived that claim as well. *See Commonwealth v. Russell*, 209 A.3d 419, 429 (Pa. Super. 2019) (citation omitted) (holding that the waiver rule allows a trial court to correct an error timely drawn to its attention when it can "quickly and easily prevent the need for a new trial," and that the failure to assert a timely objection waives the claim because the appellate court "should not be required to waste judicial

resources correcting a problem that the trial court could have easily corrected" had it been given the opportunity to do so). Because Padikal made no objection at trial to the remark he now asserts compels the grant of a new trial, he prevented the trial court from correcting any possible error. Thus, his claim of prosecutorial misconduct is unreviewable. **See Russell**, 209 A.3d at 429.

Even if Padikal's challenges to the gun references were reviewable, they would not merit relief. Padikal argues that this was improper character evidence under Pa.R.E. 404(b). But, Padikal lawfully possessed the gun, and a person may lawfully possess a firearm for which he has a license. **See District of Columbia v. Heller**, 554 U.S. 570, 636 (2008) (holding that a ban on licensed handgun possession in the home violates the Second Amendment). Additionally, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect would be to prejudice the jurors, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. **See Commonwealth v. Sneed**, 45 A.3d 1096, 1110 (Pa. 2012).

The trial court found that even if reviewable, Padikal's challenge to evidence that he had a gun would be meritless because possession of a gun

is not a prior bad act, and that Padikal lied to police about the gun[12] was admissible to show his dishonesty with law enforcement. The trial court also found that any error in the admission of the evidence of the gun or the prosecutor's reference to it in closing argument was harmless. **See** Trial Court Opinion, 7/16/21, at 13.

Were we to reach the merits of Padikal's claim, we would find it meritless, although on somewhat different grounds than those cited by the trial court.[13] Padikal had a license to own a gun. **See** N.T., 6/20/19, at 8. Evidence that he had a licensed gun in his home was, therefore, not evidence of a crime or a bad act. **See Heller**, 554 U.S. at 636.[14]

Similarly, even had Padikal preserved a claim of prosecutorial misconduct, he could not prevail. The trial court found that the prejudice, if

---

[12] Padikal first told the police that he did not have the gun, then said it was not in the house, that he lost it, or that he gave it back to the person from whom he bought it. **See** N.T., 6/20/19, at 5; C-11 at 07:05-10:00.

[13] **See Commonwealth v. Lehman**, 275 A.3 513, 520 n. 5 (Pa. Super. 2022) (holding than an appellate court may affirm a lower court's decision on any proper grounds without regard to the ground relied upon by the lower court).

[14] Evidence of Padikal's possession was not offered to show his propensity to commit crime, but to place in context his interview with Bensalem police. At the beginning of that interview, Padikal complained about the force the New Jersey law enforcement officers used when they entered his house and detained him. **See** C-11 at 06:28-07:05. Detective Nieves explained to Padikal that police databases showed that he had a license to own a gun and that under such circumstances, police – in this case, the New Jersey officers who made initial home entry – exercise greater caution in the interests of safety. **See** C-11 at 07:05-10:00.

any, from the prosecutor's unobjected-to remark was *de minimis*.[15] We agree that even had Padikal preserved his claim he could not show that the prosecutor's remark so prejudiced the jurors, forming in their minds fixed bias and hostility toward the defendant, that they could not weigh the evidence objectively and render a true verdict. ***See Sneed***, 45 A.3d at 1109-10. On this record, it is clear that the jury convicted Padikal based on compelling, abundant, and corroborated evidence that he sexually abused a prepubescent girl in his care for years, and admitted to that abuse in writing and in a recorded conversation (even offering to pay her to withdraw the charges), while claiming that she had seduced him into sexual contact with her when she was a child. For the same reasons, Padikal could not show that the prosecutor's reference to his lawful possession of a licensed gun had a prejudicial effect on the jury's verdict. ***See Williams***, 274 A.3d at 735. Thus, no relief is due.

Judgment of sentence affirmed.

---

[15] In relevant part, the prosecutor stated that Padikal had lied multiple times in his statement to police. The prosecutor highlighted Padikal's statements that he did not have his gun and thought he had sold it back to the person from whom he bought it. The prosecutor stated, "But what was recovered from the house during the search? The firearm." N.T., 6/21/19, at 24, citing C-11.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/14/2022</u>