J-A04017-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL GIBBONS | |
| Appellant | No. 2647 EDA 2015 |

Appeal from the Judgment of Sentence dated March 27, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007309-2013

BEFORE: SHOGAN, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED JULY 26, 2017**

Appellant Michael Gibbons appeals from the judgment of sentence entered following his jury trial convictions for first-degree murder and criminal conspiracy.[1] We affirm.

The evidence presented at trial established that Appellant and Lamar Ogelsby murdered Robert Rose. In mid-November 2006, Rose and his girlfriend, Tamia Hill, purchased a vehicle from Ogelsby, and the car had begun to malfunction. In the early morning of December 24, 2006, Rose arrived at Tamia Hill's townhouse apartment under the influence of drugs and alcohol. Tamia Hill's brother, Troy Hill, was also at the apartment. Troy

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 903(2).

Hill heard Rose outside in the courtyard, yelling for Ogelsby to return his money for the purchase of the car. Troy went outside and saw Rose hitting and robbing two people who were selling drugs under the direction of Ogelsby and Appellant, in an attempt to recoup the money he had spent on the car. Troy Hill brought Rose inside the apartment a few times in an attempt to calm him down, but it was to no avail. Rose repeatedly returned to the courtyard, shouting Ogelsby's name. Eventually, Ogelsby and Appellant entered the courtyard from either side and opened fire on Rose as he ran. Rose was pronounced dead at the hospital an hour later. **See** Trial Ct. Op., 12/24/15, at 3-4; N.T., 3/25/15, at 8-17, 76-85.

In 2009 and 2010, Troy Hill made statements to federal prosecutors regarding Rose's murder, and identified Appellant and Ogelsby from photographic lineups.[2] In September 2010, Tamia and Troy Hill's cousin, Khalif Hill, stated to the police that he had seen Appellant and Ogelsby shoot Rose. Khalif was a neighbor of Tamia Hill and had been able to view the courtyard from his living room window. **See** Trial Ct. Op. at 5.

In February 2012, arrest warrants for Ogelsby and Appellant were issued. Ogelsby was apprehended in Los Angeles, California.[3] Appellant was

---

[2] Troy Hill was facing federal robbery charges in 2009, and his statement about the Rose shooting was part of a proffer agreement to reduce his sentence. N.T., 3/25/15, at 92-103.

[3] Ogelsby's trial took place prior to and separate from Appellant's, due to the length of time it took to apprehend Appellant. Trial Ct. Op. at 6 n.4.

located and arrested a year later in North Philadelphia. At the time of his arrest, Appellant was seated on a sofa, and a loaded firearm was found sticking out from a cushion next to his hip. The firearm's registration indicates that it was purchased in Bartow, California, in 1986, by a California resident who has been deceased since 2008. It was later determined and remains undisputed that the firearm found with Appellant was not involved in the murder of Rose in 2006. **See** Trial Ct. Op. at 5-6.

Appellant's jury trial took place in 2015. Prior to trial, Appellant moved for the exclusion of testimony about Appellant having been in California and about the firearm found with Appellant at the time of his arrest.[4] The court ruled that the testimony placing Appellant in California was inadmissible hearsay, but that the testimony surrounding the firearm and ammunition was admissible.

Appellant also moved prior to trial for the admission of evidence that Troy Hill committed a shooting in the same courtyard where Rose was killed, six months after Rose's shooting.[5] The court denied the motion, and prohibited testimony from the victim or the eye-witness to that shooting.

At trial, Troy Hill testified against Appellant in accordance with his statements to the police. **See** N.T., 3/25/15, at 72-121, 127-185. He also

---

[4] Appellant made other pre-trial motions which are not at issue here.

[5] Charges related to this shooting were dismissed for lack of prosecution at the preliminary hearing stage, because the victim, Khalil Gardner, never came to court. N.T., 2/20/15, at 10.

admitted that he began selling drugs for Appellant and Ogelsby following the incident, out of fear for his safety. ***See id.*** at 89-92, 127-32, 173-75.[6] Khalif Hill testified that he had lied in his statement to the police and that he had not actually witnessed the shooting. ***See*** Trial Ct. Op. at 5; N.T., 3/24/15, at 86-113.[7] Tamia Hill testified that she was home in bed at the time of the shooting and did not come out of her apartment until she learned that her boyfriend had been shot. ***See*** N.T., 3/25/15, at 29.[8]

Officer Robert Stott, of the Firearms Identification Unit, was introduced as an expert in the field of firearms and tool-mark identification. Two ballistics reports were introduced into evidence, as Commonwealth's Exhibits's 51 and 52. Officer Stott did not examine the ballistics evidence in this case, but testified based on the reports prepared by the other examiners. Officer Stott testified that in his expert opinion, all of the .45 auto-caliber cartridge casings found at the scene had discharged from the same weapon, and all of the 9 millimeter casings were fired from another

---

[6] Troy Hill was also questioned about whether his testimony would result in a reduction to his federal sentence, which he answered in the negative, and whether he had been threatened by Appellant or offered a bribe by Appellant not to testify, which he answered affirmatively.

[7] Khalif Hill was also confronted at trial with his testimony from the preliminary hearing in this case, where he stated that he did not wish to testify against Appellant because "it could be dangerous towards his life." N.T., 3/23/15, at 119-128.

[8] Tamia testified that she learned that Rose was shot from an unnamed person who was not Troy Hill; Troy testified that he was the first to tell Tamia that Rose had been shot. ***See*** N.T., 3/25/15, at 50, 86, 150-51.

weapon. The bullet specimens retrieved at the scene were inconclusive regarding whether two or more weapons had been used in Rose's shooting.[9] Appellant did not cross-examine Officer Stott or object to the introduction of the ballistics reports as evidence. Copies of the reports were not provided to the jury. N.T., 3/26/15, at 118-39.[10]

_____

[9] The expert's testimony included the following:

> [Commonwealth:] So we have the .45 FCCs [(fired cartridge casings)] all chambered and extracted from the same firearm?
>
> [Officer Stott:] Correct.
>
> [Commonwealth:] And the 9 millimeter FCCs all fired from the same firearm?
>
> [Officer Stott:] That's correct.
>
> . . .
>
> [Commonwealth:] So Officer Stott, in summary, there is evidence of two firearms used in this incident, a .45 and a 9 [millimeter]. At least two firearms?
>
> [Officer Stott:] Correct.
>
> [Commonwealth:] But there is no evidence with a reasonable degree of scientific certainty that there was third firearm?
>
> [Stott]: That's correct.

N.T., 3/26/15, at 133-38.

[10] The trial testimony does not make clear why there were two reports rather than one, and the trial exhibits have not been included in the certified record. According to the briefs of the parties, the first report was issued in
*(Footnote Continued Next Page)*

Officer Alfie Wong Shing, who had been Appellant's probation officer in 2009, testified that Appellant had reported for probation regularly until 2012, including on the morning the warrant was issued, but did not report after the warrant was issued. His phone number was abruptly disconnected, and the probation department was unable to locate him. N.T., 3/25/15, at 210-15.

The Commonwealth presented several of the officers who were involved in apprehending Appellant. Officer Joseph Goodwin testified that he received a tip on a location from the Fugitive Squad Unit of the Homicide Division, and, while surveilling that location, Officer Goodwin observed Appellant arrive in a vehicle and enter the building. The police entered and arrested Appellant, who initially provided a fake name. N.T., 3/26/15, at 46-55.

Officer James Burke, Jr., testified that when he entered the building to arrest Appellant, Appellant had been sitting on one side of a couch (with his girlfriend sitting at the other), and that the butt of a revolver (of a different caliber than the semi-automatic handgun that was used in the shooting of Rose) was sticking out from in between the cushion and the arm of the

_(Footnote Continued)_ ————————————

2008, and was admitted as evidence during Ogelsby's trial. A few pages of testimony from that trial, which were included as part of the reproduced record in this appeal, suggest that the 2008 report was inconclusive on whether all of the 9 millimeter fired cartridge casings were discharged from the same firearm. The second report was issued in 2014, prior to Appellant's trial.

couch. N.T. 3/26/15, at 67-72, 77. The court allowed the gun to be shown to the jury as an exhibit, overruling Appellant's objection. *Id.* at 5-9, 69-70. After the testimony, Appellant requested that the jury be immediately instructed regarding the limited purposes for which the handgun may be considered as evidence, but that request was denied. *Id.* at 78-82.

Officer James Burke, Sr., a member of the Fugitive Squad, testified that he began searching for Appellant five days after the arrest warrant was issued, and that the Squad went to numerous addresses and set up surveillance in an attempt to locate Appellant. The officer also testified that the gun found with Appellant at the time of his arrest was purchased in Barstow, California, and registered to a person with an address in Fort Irwin, California, who had died in 2008. N.T., 3/26/15, at 84-110.[11]

During the Commonwealth's closing argument, Appellant made three objections to statements made by the prosecutor.[12] After the third objection,

_____

[11] The Commonwealth also presented Officer Tyrone Harding (first responding officer), Officer Daniel Gilmore (responded to radio call), Officer Kenneth Bolton (responded to radio call), Dr. Edwin Lieberman (expert in forensic pathology who performed autopsy on Rose), Detective Theodore Hagan (took statement from Khalif Hill in 2010), and Officer Clyde Frasier (photographed and collected physical evidence at the crime scene). Appellant presented Tearia Porter King, his former girlfriend, who testified that on the night of Rose's shooting Appellant was at home asleep.

[12] Appellant first objected to the statement that "Corner boys don't keep guns on them. That is for the higher-ups." N.T., 3/27/15, at 60. Appellant's second objection was to the following statement by the prosecutor:

*(Footnote Continued Next Page)*

the court instructed Appellant to "make note of any objections you want to make and we'll do them later." N.T., 3/27/15, at 66. Appellant relayed additional objections to the court and opposing counsel after the closing arguments concluded, outside of the presence of the jury. *Id.* at 96-97. Among those were the following:

> [The prosecutor] said that "corner boys," I assume that is referring to the drug workers that Troy testified to. Corner boys do not have guns. Corner boys would not have machine guns. He said that the defense theory was insane. I can't imagine how many times he may have said that.
> . . . He said that the Pontiac Bonneville was chopped up.

N.T., 3/27/15, at 96.[13]

*(Footnote Continued)* ─────────────

> There was a separation order I had signed by a judge that no sheriff, no correctional officer is to put [Appellant and Khalif Hill] together or have any contact with them. They are supposed to be separate. And there is no eyes down at the sub-basement. There is nothing that we can do in the District Attorney's office or Philadelphia Police Department to protect these witnesses and everyone in the street knows it.

*Id.* at 64-65. Appellant's third objection was to the statement:

> Because at that time [Appellant] was locked up by the Feds. And if you don't know, you don't mess with the Feds. When you get locked up with the Feds your life is at a crossroads. You are done. You are done. The Feds don't joke around. They don't mess around. You are done. They cherry-pick their cases.

*Id.* at 66.

[13] Appellant's other objections were:

*(Footnote Continued Next Page)*

When charging the jury, the court instructed that the firearm —

> was introduced for the limited purpose of showing evidence of flight and of showing the circumstances of the arrest. [This evidence may not] be considered by you in any way other than for the purposes I have just stated. You must not regard either piece of that evidence of showing that the defendant is a person of bad character or of criminal tendency from which you might be inclined to infer guilt.

N.T., 3/27/15, at 116-17.

After his conviction, Appellant was sentenced to life imprisonment for first degree murder, with no further penalty for the conspiracy charge. Appellant filed post-sentence motions on April 1, 2015, which were denied by operation of law; Appellant thereafter filed a notice of appeal and a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.

Appellant raises the following issues for our review:

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

> He said that he has had this case for three years, so he knows the case. He said that he entered a separate -- obtained a separation order that [Appellant] and Khali[f] Hill were to be separated in the sub-room. He said that federal cases are treated much more severe[ly] tha[n] criminal cases in the state court and therefore represented a crossroads.
>
> . . . He said . . . the gun that [Appellant] was arrested [with], that gun that was recovered was a "Dirty Harry," not sure how many times he used that term. He said [Appellant] was involved in California -- in California, in Los Angeles because that gun -- even though that gun was last seen in California in 1986. And he said that those two drug workers went and told their boss -- really -- which was something that bothered me.

N.T., 3/27/15, at 96-97.

I. Did the trial court abuse its discretion when the court denied the defense motion *in limine* to exclude testimony concerning an unrelated firearm and ammunition?

II. Did the trial court abuse its discretion when the court overruled a defense objection to the unrelated firearm being physically shown to the jury?

III. Did the trial court abuse its discretion when the court denied a defense motion *in limine* to introduce evidence Troy Hill committed another shooting months after the crime at issue at the exact same location?

IV. Did the Commonwealth commit prosecutorial misconduct when the Commonwealth elicited from the ballistics expert only the conclusion from the 2014 revised report and did not elicit that the original 2008 report found the .45 FCC markings were inconclusive?

V. Did the trial court err when the court denied Gibbons relief for the prosecutorial misconduct during the Commonwealth's closing argument?

Appellant's Brief at 4 (italicization added).

## Admission of Firearm Evidence

In his first two issues, Appellant argues that the trial court abused its discretion when it (1) denied his pre-trial motion to exclude testimony at trial related to the firearm and ammunition that were recovered at the time Appellant was arrested, and (2) overruled his trial objection to allowing the firearm to be shown to the jury as an exhibit. "The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. McFadden**, 156 A.3d 299, 309 (Pa. Super. 2017) (quoting **Commonwealth v. Bardo**, 709 A.2d 871 (Pa. 1998)). "An

- 10 -

abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***Commonwealth v. Hairston***, 84 A.3d 657, 664-65 (Pa.) (quotation omitted), ***cert. denied***, 135 S. Ct. 164 (2014).

Appellant first argues that evidence related to the gun should have been excluded because there was insufficient evidence that the gun belonged to Appellant. Although it was found in the same room as Appellant, the gun was not found on Appellant's person; there were two other adults in the home when the police arrested Appellant; and there was no testimony that Appellant lived in the home. Appellant's Brief at 18-19, 21-22 (citing ***Commonwealth v. Sanes***, 955 A.2d 369, 374 (Pa. Super. 2008)[14]).

Appellant next argues that the firearm was irrelevant as it was not the weapon used in the instant crime. Appellant's Brief at 19-20 (citing ***Commonwealth v. Robinson***, 721 A.2d 344, 351 (Pa. 1998), ***cert. denied***, 528 U.S. 1082 (2000), and ***Commonwealth v. Marshall***, 743 A.2d 489, 492-93 (Pa. Super. 1999), ***appeal denied***, 757 A.2d 930 (Pa. 2000)).

---

[14] We note that this case was disapproved of by ***Commonwealth v. Hanson***, 82 A.3d 1023 (Pa. 2013).

Appellant also argues that the firearm had little probative value regarding whether Appellant fled to California after the murder or possessed the gun in order to evade capture. The firearm was purchased in California in 1986, 25 years before it was found with Appellant in Philadelphia; and the purchaser had a California address, but was born in Texas and had a Texas license plate. Appellant contends that the gun therefore does little to prove that Appellant was ever in California. Appellant's Brief at 22-23. Nor was the gun proof that Appellant had the intent to evade arrest. Appellant argues that, unlike the defendant in **Commonwealth v. DeJesus**, 880 A.2d 608, 619 (Pa. 2005), who possessed a sawed-off shotgun, knew he was a fugitive, and demonstrated an unwillingness to surrender, no evidence indicated that Appellant would have used the firearm to evade authorities. Appellant's Brief at 20-22.[15]

_____

[15] The Commonwealth argues that this portion of Appellant's argument is waived. Commonwealth's Brief at 13. We do not agree. In his pre-trial motion, Appellant argued against "any reference at trial, to the effect that [Appellant] was with his codefendant Lamar Oglesby in Los Angeles California prior to Ogelsby's apprehension there as a fugitive on March 16, 2012. According to the discovery received to date, it appears that there is no proper, non[-]hearsay evidence that could be offered to establish this fact, which would cause undue prejudice to [Appellant]." **See** Supplemental Motion in Limine, 5/12/14, at 1-2. In the Commonwealth's response to Appellant's motion, the Commonwealth asserted for the first time that the handgun found at the time of Appellant's arrest was purchased in California, and therefore should be admitted as circumstantial evidence to show Appellant's flight to Los Angeles. Commonwealth's Response to Defendant's Supplemental Motion in Limine, 5/23/14, at 1-6. The Commonwealth's response was filed the Friday before the Tuesday hearing on the pre-trial motion. Immediately prior to the hearing, the Commonwealth provided the

_(Footnote Continued Next Page)_

Finally, Appellant argues that the "unfair prejudice of telling the jury a murder suspect was found near [] a loaded firearm is extreme," and likely to inflame the jury. Appellant's Brief at 23 (citing Pa.R.E. 403). Appellant argues that in addition to the testimony surrounding the gun, "[d]isplaying the gun to the jury was inflammatory and the prejudice outweighed the nonexistent value of the physical evidence." *Id.* at 25. Appellant asserts "[t]here was no issue here of what the gun looked like or how it operated. . . . There was no further probative value derived from showing the jury the physical firearm, but significant unfair prejudice resulted." *Id.*

The court admitted both the gun and the testimony surrounding its recovery because that evidence was relevant as circumstantial proof of Appellant's flight to California and his efforts to evade police, which, in turn, prove his consciousness of guilt. *See* Trial Ct. Op. at 7-8 (citing, *inter alia*, *DeJesus*, 880 A.2d at 615, for the proposition that "Possession of a firearm other than the murder weapon at arrest is admissible 'to support . . . the implication' that a defendant is 'serious in his intention to continue to evade — indeed that he means to repel — police custody"). The court found that the overall level of evidence that Appellant fled was sufficient to be

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

discovery materials relating to the arrest of Appellant and recovery of the firearm. *Id.* at 20-21. We decline to find this issue waived where Appellant (1) made clear prior to trial his position that there was insufficient admissible evidence of flight to make any reference to flight inadmissible, and (2) was not apprised of the Commonwealth's argument (that the handgun was purchased in California and was therefore evidence of flight) until the 11th hour. *See* N.T., 5/27/14, at 8-9.

- 13 -

contemplated by the jury, that there was sufficient evidence that the gun belonged to Appellant, and that, because the weapon was excluded as the murder weapon, its prejudicial effect at trial would not outweigh its probative value. Trial Ct. Op. at 8.[16]

_____

[16] In its Rule 1925(a) opinion, the court noted that the following evidence supported a conclusion that Appellant fled:

> Appellant had faithfully reported to his probation officers in the three (3) years prior to the time the warrant was issued for his arrest. Appellant reported to a 10:40 A.M. meeting he had with his probation officer the same day that the warrant was issued, and thereafter never reported to another meeting. Attempts by his probation officer to reach him or his girlfriend by phone days after the warrant was issued revealed that the numbers had both been disconnected. Over the span of a year, the Fugitive Squad made at least eleven (11) visits to locations where Appellant was known to frequent or had contacts. At each of these locations, which included his home, the homes of family members, and the home of his girlfriend, detectives informed the inhabitants that Appellant was wanted and left information for them to contact police if Appellant appeared. A month after Ogelsby was apprehended in Los Angeles, California, detectives spoke to Appellant's girlfriend about Appellant's whereabouts and she provided information that Appellant had driven to her house in a car that was registered to Ogelsby. This collection of evasive conduct alone was sufficient to show flight, however in tandem with Appellant's behavior leading up to his arrest, the jury was also entitled to consider the events surrounding Appellant's apprehension.

> . . . At the time of Appellant's arrest, a loaded . . . revolver with six (6) rounds of ammunition and a magazine . . . was recovered from the couch where he was seated. The weapon was purchased in Bartow, California and registered to [an] individual in California who had been deceased since 2008. Appellant gave a fake name to officers.

*(Footnote Continued Next Page)*

We agree with the ruling of the trial court. First, there was sufficient evidence that Appellant possessed the gun recovered at the time of his arrest. "Constructive possession has been defined as the ability to exercise a conscious dominion over the [contraband]: the power to control the contraband and the intent to exercise that control." **Commonwealth v. Macolino**, 469 A.2d 132, 134 (Pa. 1983). The "intent to maintain a conscious dominion may be inferred from the totality of the circumstances." **Id.** "[A]lthough mere presence at a crime scene cannot alone sustain a conviction for possession of contraband[,] a jury need not ignore presence, proximity and association when presented in conjunction with other evidence of guilt." **Commonwealth v. Vargas**, 108 A.3d 858, 869 (Pa. Super. 2014) (internal quotation marks and citation omitted).

Here, the Commonwealth presented testimony that the firearm was found near Appellant's hip at the place where he was seated when the police announced their arrival at Appellant's girlfriend's home. This was sufficient evidence to enable the jury to conclude that the handgun belonged to Appellant.

Next, the firearm was relevant evidence that Appellant had fled from authorities. "[W]hen a person commits a crime, knows that he is a suspect,

_(Footnote Continued)_ ───────────────

> Evasion from apprehension was relevant as it tended to make the fact that Appellant was guilty more probable.

Trial Ct. Op. at 8-9 (citations to trial testimony omitted).

- 15 -

and conceals himself, . . . such conduct is evidence of consciousness of guilt, which may form the basis, along with other proof, from which guilt may be inferred." **Commonwealth v. Bruce**, 717 A.2d 1033, 1037-38 (Pa. Super. 1998), **appeal denied**, 794 A.2d 359 (Pa. 1999). Where a seemingly unrelated firearm constitutes evidence of flight, it is rendered admissible. In **DeJesus**, the defendant's ex-girlfriend saw him several times after he committed a deadly shooting, and requested that he turn himself into the police, but he refused. **DeJesus**, 880 A.2d at 613. On one of these occasions, the defendant was carrying a sawed-off shotgun, a fact which was corroborated by an eye-witness. **Id.** The defendant successfully evaded capture for three months, until he was located by the Philadelphia Police Fugitive Squad. A few weeks prior to his arrest, the defendant escaped near-capture following a car chase with police. **Id.** at 612, 612 n.5.

Although the firearm was not the same one that had been used in the murder, our Supreme Court upheld the admission of testimony regarding the shotgun at trial. The Court stated that the evidence "that [the defendant] possessed a sawed-off shotgun was support for the implication that [the defendant] was serious in his intention to continue to evade—indeed, that he had the means to repel—police custody. The testimony regarding the shotgun was relevant in this aggregate context." **DeJesus**, 880 A.2d at 615. The Court held that not only was the testimony relevant, but (1) it's probative value was not outweighed by its prejudicial nature, (2) the trial

court instructed the jury on the limited purpose for which it may consider the evidence, and (3) even assuming the testimony should have been excluded, its admission constituted harmless error where there was overwhelming other evidence presented at trial, such as an admission by the defendant, on which to convict. *Id.* at 615-16.

Here, the Commonwealth provided ample evidence that Appellant had purposefully evaded capture, aside from his possession of the gun: Appellant drastically changed his pattern of living as soon as he was wanted by the police, and gave them a fake name when they finally found him. That the gun was registered to a deceased resident of the Los Angeles area was probative of whether Appellant resided in California for a period following the murder; and, along with the other evidence surrounding Appellant's flight, the existence of the gun generally supported the idea that Appellant was attempting to evade police custody. *DeJesus*, 880 A.2d at 615. The fact that there was no evidence that Appellant had yet employed the gun in his efforts to escape the police is meaningless.[17]

Finally, in evaluating the prejudicial nature of the evidence, a court should be guided by the following:

---

[17] Appellant's argument that **Robinson**, 721 A.2d at 344, or **Marshall**, 743 A.2d at 489, precludes the admissibility of the firearm (because it was not the murder weapon) is without merit. In those cases, the trial courts were not presented with the argument that the weapons were evidence of flight.

> Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. . . .
>
> > In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including . . . the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Commonwealth v. Page*, 965 A.2d 1212, 1220-21 (Pa. Super. 2009) (quotation marks, brackets, and citations omitted), *appeal denied*, 74 A.3d 125 (Pa. 2013).

Here, it was established at trial that the gun before the jury was not the murder weapon. In fact, no testimony indicated that the gun had ever even been used. We cannot therefore say that admission of the firearm, in either the testimony surrounding it or its physical form as an exhibit before the jury, would have so inflamed the jury as to convict Appellant on an improper basis.

Moreover, any potential prejudice caused by the evidence surrounding the gun was alleviated by the instruction given to the jury, which was not to use it to infer that Appellant was a person of "bad character" or had "criminal tendencies." *See DeJesus*, 880 A.2d at 615-16.[18] Appellant's first two issues merit no relief.

_____

[18] We note that during his closing argument, the prosecutor made a similar statement: "Do not convict him because he was on probation. Do not convict him because he had a gun. That evidence was brought to you for a reason.
*(Footnote Continued Next Page)*

- 18 -

## Exclusion of Evidence Surrounding Troy Hill

Appellant argues that the trial court abused its discretion by excluding evidence that Troy Hill committed a shooting at the same location as the shooting of Rose, six months later. Appellant asked to call the victim of that attack, Khalil Gardner, to testify. ***See*** N.T., 2/20/15, at 7-8.[19] Appellant contends that Gardner's testimony regarding the incident would —

> show the jury that [Troy Hill] was trying to control the drug corner; this is all about drugs, and that Troy Hill testified during the trial of the codefendant that he became a drug operative at that corner following this homicide and that is when Mr. Gardner gets shot. It is all interconnected and, in fact, there was testimony at the other trial that the codefendant and Troy Hill got into a violent personal physical fight [with Ogelsby] over the Khalil Gardener incident. So, it is all interconnected in terms of bias. . . .
>
> If your honor will permit me to, I will call the Gardner victims that were arrested by the Commonwealth in that incident to testify that this man shot him and this man stabbed his brother over, it is undoubtedly over the same drug dealing operation that the first crime occurred over six months earlier at the same location.

N.T., 2/20/15, at 7-8. According to Appellant, "we think Troy Hill shot Robert Rose . . . because he was angry that Robert Rose was interfering with Troy Hill's drug operatives." ***Id.*** at 14-15.

Appellant asserts that he would not have introduced evidence of the Gardner shooting in order to undermine Troy Hill's credibility as a witness,

_(Footnote Continued)_ _____

It is to show his consciousness of guilt. Because he fled and he concealed himself." N.T., 3/27/2015, at 80.

[19] Troy Hill allegedly both shot Khalil Gardner and stabbed Khalil Gardner's brother during the same incident.

but as substantive proof that Troy Hill committed the instant crime. **See** Appellant's Brief at 28. Appellant claims that Rule 609 does not apply,[20] and that the evidence is permissible under Rule 404(b) to show Troy Hill's motive to shoot Rose (as an attempt to control drug trafficking in the area) and to identity him as Rose's shooter through a common plan, scheme, or design. **Id.** at 26-29 (citing **Commonwealth v. Thompson**, 779 A.2d 1195, 1201 (Pa. Super.), **appeal denied**, 790 A.2d 1016 (Pa. 2001), **Commonwealth v. McGowan**, 635 A.2d 113, 115 (Pa. 1993), and **Commonwealth v. Clayton**, 483 A.2d 1345, 1349 (Pa. 1984) (plurality)).

According to the Commonwealth, Gardner gave a statement to the police after his attack by Troy Hill, and testified at Ogelsby's trial regarding the incident; however, Gardner never stated Troy Hill's motive for shooting him, or even mentioned drug dealing. N.T., 2/20/15, at 11; Commonwealth's Brief at 18.[21] Therefore, any testimony supplied by Gardner as a witness would relate only to that incident and have no connection to the shooting of Rose. Additionally, as the Gardner shooting did

---

[20] Rule 609(a) provides, "For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement."

[21] Troy Hill was never prosecuted for attacking Gardner because Gardner refused to testify.

not lead to conviction, the testimony would be inadmissible as impeachment evidence against Hill's credibility under Rule 609(a).

Rules 400-412 of the Pennsylvania Rules of Evidence address the relevancy of evidence. Generally, evidence that is relevant to a consequential issue is admissible at trial. *See* Pa.R.E. 401, 402. However, Rule 403 states: "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 404 also provides, in pertinent part:

(b) *Crimes, Wrongs or Other Acts*.

(1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

To be admissible under the motive exception, "there must be a specific logical connection between the other act and the crime at issue which establishes that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances."

***Commonwealth v. Ross***, 57 A.3d 85, 100 (Pa. Super. 2012) (*en banc*) (quotation marks and citation omitted), ***appeal denied***, 72 A.3d 603 (Pa. 2013). To be admissible to prove the identity of a perpetrator through a common scheme, plan, or design, the crimes at issue must be —

> so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial,—in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

***Commonwealth v. Rush***, 646 A.2d 557, 560 (Pa. 1994) (emphasis omitted). The crimes must "share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant." ***Commonwealth v. Weakley***, 972 A.2d 1182, 1189 (Pa. Super.), ***appeal denied sub nom. Commonwealth v. Selenski***, 986 A.2d 150 (Pa. 2009).

We find that the trial court did not err in excluding the evidence of the Gardner shooting, because the offer of testimony established that the evidence would not have been relevant to the instant shooting. The evidence of Gardner's shooting could not have proven a motive for Rose's shooting, which came before it. ***Ross***, 57 A.3d at 100. Nor were the alleged facts of the Gardner shooting so uniquely similar to the facts of Rose's shooting as to evince a *modus operandi* by which the evidence of the second shooting would be admissible to identify Troy Hill as Rose's actual killer. ***Weakley***, 972 A.2d at 1189. Furthermore, although the evidence, from which

Appellant wished the jury to speculate, would be of small probative value, it would be greatly damaging to the credibility of Troy Hill, the Commonwealth's main witness. Pa.R.E. 304.[22] We therefore hold that the trial court properly excluded the testimony surrounding the Gardner shooting.

Because Appellant argues that the evidence was not offered for impeachment purposes, we need not decide whether Gardner's testimony would have been admissible as extrinsic evidence of Troy Hill's motive for testifying.[23]

### Prosecutorial Misconduct Related to Expert Witness

Appellant next argues that the Commonwealth committed prosecutorial misconduct in its examination of the ballistics expert. "Our

---

[22] Appellant's reliance on **Thompson**, **McGowan**, and **Clayton** is misplaced. In **Thompson**, 779 A.2d at 1195, we held that evidence that the drug trafficking history of another passenger riding in a car with the defendant was admissible to show that the other passenger, and not the defendant, constructively possessed the cocaine found in the vehicle. In **McGowan**, 635 A.2d at 113, the Pennsylvania Supreme Court held that it was reversible error to prevent the defendant from presenting evidence of other, similar drug store robberies that he had been falsely accused of committing. In **Clayton**, 483 A.2d at 1345, a plurality of the Pennsylvania Supreme Court upheld the admission of evidence of another murder by the defendant, where the murders were close in geographic proximity, occurred four months apart, both involved the drug trade, and both involved the same murder weapon. In each of these cases, the evidence offered to identify the perpetrator consisted of evidence of very similar other crimes (drug possession, burglaries, murder).

[23] We note that Rule 609 governs only impeachment evidence related to character for untruthfulness, and not impeachment evidence offered to attack a witness's credibility on the basis of bias, interest, or corrupt motive.

standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." **Commonwealth v. Melvin**, 103 A.3d 1, 26 (Pa. Super. 2014) (internal citations and quotation marks omitted).

Specifically, Appellant complains that when the prosecutor was questioning the ballistics expert, he only elicited the conclusion of the 2014 supplemental report, which stated that all eight .45 fired cartridge casings were definitively fired from the same gun; the prosecutor did not address the conclusion of the 2008 original report, in which the expert determined that only three of the eight casings could definitively be said to have been fired from the same gun. Appellant's Brief at 30-32.[24] The difference affected the jury's conclusion that only two firearms were involved in the shooting, and constituted false and misleading evidence which the Commonwealth was obligated to correct. **Id.** (citing **Commonwealth v. Ali**, 10 A.3d 282, 294 (Pa. 2010), and **Napue v. People of State of Ill.**, 360 U.S. 264, 272 (1959)).

Appellant's argument is waived. Appellant did not object to the introduction of the 2008 report, did not object to the expert's testimony, and

_____

[24] Appellant stresses that the Commonwealth was aware of the conclusion of the 2008 report, because the expert testimony at Ogelsby's trial was based on that report, and not the later report.

did not raise the issue after trial in his post-sentence motion. The first mention of this argument is in Appellant's Rule 1925(b) statement. Appellant has therefore failed to preserve this issue for our review. **See** Pa.R.A.P. 302 (issues not raised before the trial court cannot be raised for the first time on appeal). Nor can we deem the expert's testimony "false" or "misleading," where the earlier report, which had been inconclusive, was not directly in contradiction with the conclusive report.[25] Appellant's claim therefore also lacks merit.

## Prosecutorial Misconduct During Closing Argument

Appellant's final complaint is that the trial court erred in not granting his motion for a new trial based on remarks made by the prosecutor during his closing statement.

> It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted. Moreover, a mistrial is only warranted where the incident upon which the motion is based is of such a nature as to deny the defendant a fair trial.

**Commonwealth v. Johnson**, 668 A.2d 97, 103 (Pa. 1995) (citations omitted), **cert. denied**, 519 U.S. 827 (1996).[26]

_____

[25] We note that Appellant had the ability to cross-examine the expert regarding his conclusions and the level to which they contradicted the 2008 report.

[26] Where prosecutorial misconduct "is intended to provoke the defendant into moving for a mistrial," or "when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial," retrial is prohibited, and the defendant must be discharged.
*(Footnote Continued Next Page)*

The trial court found Appellant's final issue to be waived due to the lack of specificity in Appellant's Rule 1925(b) statement. Trial Ct. Op. at 13. In its Rule 1925(a) opinion, the court quoted the portion of the Rule which provides that "The Statement shall concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii). The court also relied on the following portion of the Note following the Rule:

> The more carefully the appellant frames the Statement, the more likely it will be that the judge will be able to articulate the rationale underlying the decision and provide a basis for counsel to determine the advisability of appealing that issue. Thus, counsel should begin the winnowing process when preparing the Statement and should articulate specific rulings with which the appellant takes issue and why.

Pa.R.A.P. 1925, Note.

We are in substantial agreement with the trial court. As we have stated,

> Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process. When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review. When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues. In other words, a Concise Statement which is too

*(Footnote Continued)* ──────────

***Commonwealth v. Smith***, 615 A.2d 321, 325 (Pa. 1992). However, Appellant's request for discharge has been waived, as he only requested a new trial in the court below.

vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.

*Commonwealth v. Ray*, 134 A.3d 1109, 1114 (Pa. Super. 2016) (quoting *Commonwealth v. Dowling*, 778 A.2d 683, 686-87 (Pa. Super. 2001)). Whether a 1925(b) Statement is overly vague is "very case-specific inquir[y]." Pa.R.A.P. 1925, Note.

Here, the matter raised in Appellant's Rule 1925(b) statement relating to this issue reads in its entirety:

> On appeal, [A]ppellant will argue the Commonwealth made numerous statements during closing arguments that were not supported by the trial evidence or were inflammatory and inappropriate. (*E.g.* N.T. 3/27/15 at 53:21 (referencing "Rat215"), 56:23 ("snitches get stitches"), 60:5-7 ("corner boys"), 67:14 (discussing federal case which defendant was unable to fully cross-examine Troy Hill about), 76:12-77:10 (asserting car vanished and was taken to chop shop), 82:10-83:10 (referring to gun as a "Dirty Harry")[)]. The Commonwealth additionally told the jury [that Appellant's] theory was insane and mind-blowing and a potential witness Christine Fonseca would not be called to testify because she was would not tell the truth. [A]ppellant will demonstrate to the Superior Court these statements and misstatements constituted prosecutorial misconduct.

Pa.R.A.P. 1925(b) Statement, at 4. Of the multiple statements made by the prosecutor which are referenced in Appellant's appellate brief, *see* Appellant's Brief at 34-36, only three were also referenced in Appellant's 1925(b) statement: the reference to "corner boys," the assertion regarding

Rose's car, and the statement that the defense theory was "insane."[27] The other statements of which Appellant complains on appeal, which were not included in his Rule 1925(b) statement, are waived. **See** Pa.R.A.P. 1925(b)(4)(vii).

Regarding the first two of the preserved claims, Appellant's Rule 1925(b) statement provides scant information, stating only that the two statements "were not supported by the trial evidence or were inflammatory and inappropriate." Rule 1925(b) does not require an explanation of the error, but it does require "sufficient detail to identify all the pertinent issues for the judge." Pa.R.A.P. 192(b)(4)(ii). More significantly, however, Appellant failed to explain the basis for his objections to these statements when he made those objections during trial or in his post-sentence motion. We therefore understand the trial court conclusion that these two complaints were waived.

Without regard to their possible waiver, however, these complaints are without merit. First, Appellant's entire argument against the Commonwealth's reference to "corner boys" is the following: "The prosecutor . . . asserted without a factual basis that '[c]orner boys don't keep guns on

---

[27] In addition to these three, the allusion to "RATS215" was raised in both the 1925(b) and in Appellant's brief to this court; however, Appellant made no objection to this comment during the closing statement, which came before the court told him to hold his objections. It has therefore been waived for failure to make a timely objection to the trial court. **See Commonwealth v. Galloway**, 771 A.2d 65, 68-69 (Pa. Super. 2001).

them[; t]hat is for higher-ups.'" Appellant's Brief at 35.[28] A prosecutor's argument must be supported by the evidence presented at trial or "legitimate inferences arising from that evidence." **Commonwealth v. Ragland**, 991 A.2d 336, 340 (Pa. Super.), **appeal denied**, 4 A.3d 1053 (Pa. 2010). However, the prosecutor's statement was supported by the trial evidence. Troy Hill was asked on re-direct examination whether, when he began selling drugs for Appellant and Ogelsby, he was armed, and whether "hand-to-hand workers, the ones that are lowest on the totem pole in the drug organization, carry guns on them, typically?" N.T., 3/25/17, at 169. Appellant answered both questions negatively. The Commonwealth therefore had a factual basis for arguing to the jury that it is unlikely Rose's shooter was a lower-level drug dealer.

Appellant's complaint relating to the prosecutor's statements regarding the car Rose purchased from Ogelsby is likewise without merit. Appellant argues the following:

> Prior to trial, the parties discussed testimony at Ogelsby's trial that Troy Hill was seen with Rose's car after his death. The Commonwealth asked for this testimony to be excluded[,[29]] and it did not come in at Appellant's trial. The Commonwealth capitalized on the exclusion of this evidence by advising the jury during closing that "after this

---

[28] The Commonwealth was attempting to disprove Appellant's theory that Troy and Khalif Hill were the actual shooters because they, as lower-level drug dealers, would not have been armed.

[29] **See** N.T., 5/27/14, at 29-30; N.T., 2/20/15, at 18-19.

> murder that car has vanished. Vanished. Completely vanished. Gone." Defense counsel objected, but the Commonwealth took it even further. The prosecutor told the jury specifically "Troy Hill and Khalif Hill have no connections to that car. That car is gone. Gone. Completely vanished." The prosecutor knew there was evidence that did not come in at trial that Troy Hill was in possession of the car after Rose's death.

Appellant's Brief at 34 (citations to notes of testimony omitted). However, the Commonwealth's argument was again properly drawn from the testimony presented at trial. Tamia Hill testified that she had not seen the car since the murder and had reported it stolen. *See* N.T., 3/25/15 at 33-34. No other evidence regarding the car's whereabouts was presented by the Commonwealth or by Appellant. The Commonwealth was therefore free to argue the reasonable, legitimate inference that the disappearance of the car was probative of its view that the killers were Appellant and Ogelsby (who had sold Rose the car), rather than Troy and Khalif Hill.

We decline to find that Appellant waived his complaint that the prosecutor labeled his theory "insane." Appellant objected to this comment at trial (once closing statements were over and the court allowed him to do so), again in his post-sentence motion, in his 1925(b) statement, and in his brief to this Court. And, because of its generality, we do not find the comment that the defense theory is "insane" so lacking in context that the trial court could not have reviewed it based on the information before it. *See* *Boykai v. Young*, 83 A.3d 1043, 1043 n.1 (Pa. Super. 2014) (declining to find an issue waived on the basis of a vague 1925(b) statement where the

trial court was "sufficiently informed so as to capably identify and address the issue in its opinion"). We therefore review its merits.

It is well-settled that "the prosecutor may not express his personal opinion regarding a defendant's guilt, credibility or trial strategy." **_Commonwealth v. Gilman_**, 368 A.2d 253, 258 (Pa. 1977) (footnotes omitted). At the same time,

> [A] prosecutor has reasonable latitude during his closing argument to advocate his case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury. The court must evaluate a prosecutor's challenged statement in the context in which it was made. Finally, not every intemperate or improper remark mandates the granting of a new trial; reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

**_Commonwealth v. Hanible_**, 30 A.3d 426, 465 (Pa. 2011) (quotation marks, citations, and brackets omitted), **_cert. denied_**, 133 S.Ct. 835 (2013).

The remark of which Appellant complains was situated within the following statement by the prosecutor:

> By the way, Troy Hill is a murderer, right? Troy Hill is a murderer. He murdered his sister's boyfriend? You are going to kill your sister's boyfriend? What motive is there, why would he do that? Khalif Hill is going to kill his cousin's boyfriend? Over what? According to them over some drug deal that had gone bad. You can fix that problem. You can fix that problem with fists if you need to. You are going to murder this man over that? Defense theory is insane. It is mind-boggling. It is insane.

N.T., 3/27/15, at 68-69.[30] The prosecutor did not emphasize that he was stating a personal opinion, and did not refer to Appellant, Appellant's counsel, or any witness as "insane." Rather, he asked the jury to consider the logic of the defense theory given the facts of the case. We therefore do not find these remarks, in context, would unavoidably create such bias and hostility within the jurors as to prevent their rendering a true verdict. *Hanible*, 30 A.3d at 465. The trial court therefore did not err in refusing to grant Appellant's motion for a mistrial.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2017

---

[30] Appellant has provided citations to three points at which the prosecutor referred to the Appellant's theory as "insane." *See* Appellant's Brief at 12 (citing N.T., 3/27/15, at 50, 62, and 68). However, Appellant made no contemporaneous trial objection to the first two remarks, which were made before the trial court asked Appellant to hold his objections. Therefore, they are waived. *See Galloway*, 771 A.2d at 68-69.